UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **JOHNNY W. ORSO, JR.** | **CIVIL ACTION NO. 3:10-cv-1069** |
| **LA. DOC #512571** | |
| **VS.** | **SECTION P** |
| | **JUDGE ROBERT G. JAMES** |
| **MARK SHUMATE, ET AL.** | **MAGISTRATE JUDGE KAREN L. HAYES** |

**REPORT AND RECOMMENDATION**

*Pro se* plaintiff Johnny W. Orso, Jr., proceeding *in forma pauperis*, filed the instant civil rights complaint pursuant to 42 U.S.C. §1983 on June 15, 2010. Plaintiff is an inmate in the custody of the Louisiana Department of Public Safety and Corrections. When he filed this suit he was incarcerated at the East Carroll Detention Center (ECDC), Lake Providence, Louisiana; he was subsequently transferred to the Caldwell Correctional Center, Grayson, Louisiana [Doc. #5] and then to the River Bend Detention Center (RBDC) [Doc. #7] which is also located in Lake Providence. Thereafter, on August 27, 2010 he was returned to the ECDC. [Doc. #15], and then, sometime prior to September 20, 2010, he was transferred to the Elayn Hunt Correctional Center, St. Gabriel, Louisiana, where he remains incarcerated. [Doc. #17]

He complains that his right to practice his religion and his right of access to the courts was interfered with by Corrections Officials at both ECDC and RBDC. He sued East Carroll's Sheriff Mark Shumate, ECDC Warden Ronnie Harris, ECDC Captain Joseph Poche, and RBDC Warden Alvin Jones praying for compensatory damages for grief, mental anguish, and emotional distress; he also prayed for punitive damages and injunctive relief.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of the court. For the following reasons it is recommended that the complaint be **DISMISSED WITH PREJUDICE** as

frivolous and for failing to state a claim for which relief may be granted.

### *Background*

***1. Original Complaint [Doc. #1]***

*a. Practice of Religion*

Plaintiff is a Native American and documented member of the Choctaw Tribe of Mt. Vernon, Alabama. He practices Native American Tribal beliefs. Plaintiff complains that "... he has been continually denied the right to practice his spiritual beliefs" since he entered into the custody of the defendants on March 8, 2010.

On March 15, 2010, plaintiff, who was then incarcerated at RBDC, requested the opportunity to discuss his spiritual beliefs with Warden Jones; Lt. Russell advised plaintiff that RBDC could not accommodate his needs and that plaintiff would be transferred to another facility.

On March 23, 2010, plaintiff's grandmother died and plaintiff "... could not obtain closure spiritually because he was still being housed at [RBDC] and he could not perform a spiritual mourning ceremony."

On April 9, 2010, plaintiff was transferred to ECDC where he met with Capt. Poche and informed him of his spiritual needs. Poche advised plaintiff that ECDC likewise could not accommodate him and advised plaintiff to have his family lobby for a transfer.

On June 1, 2010, ECDC began a month long Christian revival. On June 2, 2010, plaintiff submitted a formal grievance to Warden Harris.

Plaintiff now claims that he has endured "mental anguish by watching other inmates practice their religion while he was unable to do so... [and] by not being able to perform the tribal ceremony to mourn the passing of his grandmother."

*b. Access to Courts*

2

On June 7, 2010, plaintiff requested the services of a notary public and copies of various legal documents in anticipation of a lawsuit he intended to file in the Sixth Judicial District Court, East Carroll Parish. Plaintiff was referred to "James," the inmate counsel who questioned him about the contents of his lawsuit. Plaintiff discussed the contents of the suit to inmate counsel in confidence; however, counsel notified Lt. Hussell about the nature of plaintiff's lawsuit. Plaintiff was then denied copies and notary services unless he discussed the suit with Lt. Hussell; Hussell requested plaintiff to forego filing the suit and to allow him to handle the matter.

On June 8, 2010, plaintiff requested notary services from the inmate counsel's assistant; he advised plaintiff to leave the lawsuit with counsel and it would be placed in a folder to be held until the notary was available. Plaintiff refused to leave his pleadings and therefore he was denied notarial services.

### 2. Amended Complaint [Doc. #17]

#### *a. Practice of Religion*

On August 25, 2010, the undersigned completed an initial review and directed plaintiff to amend his complaint to provide: (1) a detailed description of the "Native American Tribal beliefs" he practices; (2) a detailed description of the ceremonies or practices essential to his practice of Native Spirituality and a statement concerning the frequency he engaged in these practices prior to his incarceration; (3) a detailed description of the spiritual mourning ceremony of the Native American religion; (4) the number of practitioners of Native American Tribal beliefs incarcerated in ECDC, RBDC, or elsewhere in Louisiana prisons; (5) a detailed description (or a copy of) the pleadings he intended to file in the Sixth Judicial District Court; and, (6) a detailed description of the prejudice he suffered as a result of the actions/inactions of the defendants with regard to both his practice of religion and his access to courts claims. [Doc. #14]

On September 20, 2010, plaintiff filed an amended complaint. [Doc. #17] In that pleading plaintiff indicated that he was now incarcerated at the Elayn Hunt Corrections Center, St. Gabriel. Plaintiff described his spiritual practices as follows:

> Since he was a small child the plaintiff has attended the Pow-Wow, a celebration to honor the Great Spirit, where the Sun Dance is performed. This ceremony happens annually in June. The Sun Dance is one of the tenets of the pipe religion, which is what the plaintiff identifies as his religion. Other tenets of the religion is [sic] the pipe ceremony, the Mourning Ceremony Ghost Dance, and the Sweat Lodge.
>
> The Sun Dance consist[s] of the tribe gathering around the Kiva, a sacred prayer circle on the reservation, to honor Father Sun with ceremonial dances. The dancers fast all day until sun down eating only after paying tribute to Father Sun. The fasting is to honor our ancestors for the struggle that they had to endure. At sundown the dancers feast on Native American foods, ending their fast and the ceremony for the day. This is a three day ceremony.
>
> The feast contains no pork or pork products, a strict diet followed by the plaintiff to honor his ancestors for the suffering that they endured...
>
> The other tenet mention in this complaint is the Mourning Ceremony which was performed by the plaintiff in 2005 when his mother died.
>
> In the Mourning Ceremony members of the tribe go to the Kiva to perform the ritual. Tribal music is played while a small fire of dried sage burns. The smoke from the sage is used to cleanse the body so it can be returned to Mother Earth and the soul so it can be returned to the Great Spirit. In this case as with the case of his mother the actual body would not be used, instead a picture would take its place. Since the plaintiff is in prison instead of a sage fire he would burn incense.
>
> The Mourner would chant to the music while cleansing himself and the deceased. The ceremony is to be performed while Father Sun is high or around noon, so that the spirit of the deceased does not become lost on their journey to cross the river to be with their ancestors.
>
> At the end of the ceremony to honor Mother Earth reclaiming the body, a handful of dust is picked up and tossed into the wind to symbolize the spirit leaving the body to join their ancestors in the after life. [Doc. #17, Part I]

Plaintiff was transferred into the custody of the East Carroll Sheriff's Department and initially placed at RBDC on March 8, 2010. Plaintiff complained that he was unable to perform the

Mourning Ceremony following the death of his grandmother on March 25, 2010. [Doc. #17, Part I, Claim 1, ¶4]

Plaintiff also complained that Christian prisoners were permitted to participate in a month long revival service. [Id., ¶6]

Plaintiff admitted that he is unaware of the actual number co-religionists in the custody of the Louisiana Department of Public Safety and Corrections, and he acknowledged that there were none at either RBDC or ECDC. He claimed that a relative called prisons in Louisiana and compiled a list of facilities where the practice of Native American Spiritual Beliefs were "available." Plaintiff also claimed that he presented this list to the defendants on multiple occasions; however, he did not provide this list in either his original or amended complaints. [Doc. #17, Part II] He also alleged that Lt. Russell compiled a list of prisons that could accommodate plaintiff's spiritual practices and promised to transfer plaintiff to one of these facilities. [Doc. #17, Part II, Claim 1, ¶3] He also claimed that Captain Poche at ECDC advised plaintiff to "have his family get [plaintiff] transferred to a facility that offers [Native American Spiritual Practices.]" [Id., ¶5] On June 16, 2010, in response to a grievance filed by plaintiff, Poche verbally assured plaintiff that he would be transferred to a facility that provides Native American Spiritual services. [Id., ¶7] When that did not occur, plaintiff filed a formal grievance concerning his desire to be transferred to a facility where he could "practice his beliefs" on August 16, 2010. [Id., ¶12] In response to that grievance, Captain Knight again assured plaintiff that he would be transferred to such a facility. [Id., ¶13-14] On September 8, 2010, Poche faxed the Department of Public Safety and Corrections requesting a transfer to accommodate plaintiff's beliefs and on September 13, 2010, plaintiff was transferred to a Department of Corrections facility for processing and eventual placement. [Id., ¶18-20]

### b. *Access to Courts*

On June 7, 2010, plaintiff requested notary services and copies in regards to a civil complaint he intended to file in Louisiana's Sixth Judicial District Court. The complaint, more or less identical to the instant complaint, alleged that the defendants were denying him the right to freely practice his religion. [Doc. #17, Claim 2, ¶21-22] Plaintiff was questioned about the contents of his lawsuit, but he refused to discuss the matter and as a consequence he was denied copies and notarial services.[Id.,¶23]

Plaintiff did discuss the contents of his complaint to inmate counsel; however, inmate counsel then discussed the complaint with Lt. Hussell. [Id., ¶24] Plaintiff was then "forced" to discuss the complaint with Hussell and was nevertheless denied notary services and copies. [Id., ¶24-25] On June 8 plaintiff returned to the law library to get notary services and copies; he was told to leave the documents and when they were notarized he could retrieve them. However, plaintiff did not leave the pleadings and he was ultimately unable to file the pleadings in the Sixth Judicial District Court because they were not notarized; he filed the pleadings in this Court instead. [Id., ¶28-29]

Later, on August 6, 2010, plaintiff attempted to submit his in forma pauperis application to this court; on that date, Lt. Johnikin at RBDC took plaintiff's federal complaint and read it over plaintiff's objection. Upon discovering the nature of the suit and the identities of the defendants, Johnikin refused to assist plaintiff and told him that he would have to wait for the approval of Captain Knight before mailing the documents to the Court. [Id., ¶30-33]

Plaintiff submitted a grievance on August 16, 2010, and, when the circumstances were explained to Captain Knight, Knight told Johnikin that he was obliged to mail the documents as requested by plaintiff. Plaintiff insisted upon a signed letter of apology from Knight and Johnikin, however they refused his demand. [Id., ¶34-38]

6

### 3. Claims for Relief

Plaintiff claimed – (1) that he was subjected to cultural and religious discrimination for six months and to the violation of his 14th Amendment Right; (2) that he was forced to endure the loss of his 1st Amendment Right to freely practice his religion when he was denied the right to perform a Mourning Ceremony on behalf of his grandmother causing emotional distress and mental anguish.; (3) that his 1st Amendment Right to Freedom of Speech was violated when he was transferred from RBDC to ECDC before his grievances were settled; (4) that his 1st Amendment Right to practice his religion was violated when he was denied the right to perform the Sun Dance and fast during the month of June to pay respect to his ancestors; (5) that his 14th Amendment right to access the court and the confidentiality of his legal mail were violated; (6) that the refusal to transfer him to a facility that offered plaintiff an opportunity to practice his religion violated his 1st Amendment right; and (7) that the failure to supply the plaintiff with an Elder, a Native American Spiritual Advisor to educate the plaintiff on other aspects of his religion violated the plaintiff's 1st Amendment Right as well as [R.S.15:828.2] Louisiana Law because [the defendants] provided pastors from outside the facility to come preach to the Christians.

### *Law and Analysis*

#### 1. Screening

When a prisoner files a complaint in a civil action seeking redress from a governmental entity or officer or employee of a governmental entity, the district court is obliged to review the complaint as soon as is feasible and to dismiss the case if it determines that the complaint is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. See 28 U.S.C.A. §§ 1915 and 1915A; see also 42

U.S.C.A. § 1997e(c) (providing that a district court shall on its own motion or the motion of any party dismiss a complaint by a prisoner regarding prison conditions if the court is satisfied the complaint is frivolous, malicious, falls to state a claim upon which relief may be granted, or seeks monetary relief from an immune defendant).

A claim is frivolous if it has no arguable basis in law or fact. *Nietzke v. Williams*, 490 U.S. 319, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). A claim has no arguable basis in law if it is based on an indisputably meritless legal theory, "such as if the complaint alleges the violation of a legal interest which clearly does not exist." *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir.1998) (quotation omitted).

A civil rights plaintiff must support his claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir.1995).

Plaintiff filed an articulate original complaint setting out the basic parameters of his claim; he was thereafter allowed to amend his complaint and was directed to provide additional factual support for his claims. Further amendment of the pleadings would serve no useful purpose as it appears that plaintiff has stated his best case. Accepting all of plaintiff's allegations as true, and, giving plaintiff the benefit of every doubt, the undersigned concludes, for the reasons stated hereinafter, that his complaint should be dismissed with prejudice.

## 2. Practice of Religion

### a. First Amendment

Plaintiff claims that his right to practice his chosen religion was curtailed by the defendants. Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion. Nevertheless, lawful incarceration, by its very nature,

8

brings about the necessary withdrawal or limitation of many privileges and rights. The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

The standard for evaluating an inmate's claim that a prison regulation or practice improperly restricts his right to the free exercise of his religion requires the court to evaluate the regulation or practice in order to determine whether it "is reasonably related to legitimate penological interests." *Id.* at 349. The "reasonableness" of a regulation or practice is evaluated based upon the following inquiry: (1) Is there a valid, rational connection between the prison practice and the legitimate governmental interest put forward by prison officials to justify the practice; (2) Are there alternative means of exercising the right that remain open to prison inmates, that is, are inmates allowed other means to express their religious beliefs on a general level; (3) What impact will accommodation of the asserted constitutional right have on guards and other inmates and on the allocation of prison resources generally; and, (4) Are alternatives to the prison practice available that would accommodate the inmates' rights at a *de minimis* cost to valid penological interests? *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), *Green v. Polunsky*, 229 F.3d 486, 489-90 (5th Cir.2000). Each factor need not be considered, and the factors need not be evaluated evenly. *Scott v. Mississippi Dep't of Corrections*, 961 F.2d 77, 80 (5th Cir.1992).

### b. RLUIPA

Liberally construed, and giving plaintiff the benefit of the doubt, it may be assumed that he also alleges a violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA) [see 42 U.S.C. §2000cc *et seq*.]. RLUIPA mandates that, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the

9

burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a).[1]

### c. Analysis of Plaintiff's Claims

Plaintiff admits that there were no other practitioners of the Native American religion incarcerated at either the ECDC or RBDC during the time that he was incarcerated there. He also explained the nature of the specific religious practices that he was unable to perform at either ECDC or RBDC as follows:

1. The Sun Dance – a ritual where the tribe gathers around a sacred prayer circle on the reservation, to honor Father Sun with ceremonial dances. The dancers fast all day until sun down eating only after paying tribute to Father Sun. At sundown the dancers feast on Native American foods, ending their fast and the ceremony for the day. This is a three day ceremony.

2. The Mourning Ceremony – another ritual where members of the tribe go to the Kiva or

---

[1] The Supreme Court has noted that RLUIPA protects the rights of prisoners who are unable to freely attend to their religious observances and who are dependant on the government's permission and accommodation. *Cutter v. Wilkinson*, 544 U.S. 709, 721, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

In order to state a claim under RLUIPA, the prisoner must show that challenged government action places a substantial burden on the exercise of his religion. If the prisoner carries the burden of proof on this issue, then the government must demonstrate some compelling interest warranting the challenged action. Under RLUIPA, a "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id. §* 2000cc-5(7)(A). Thus, religious services, religious education, and dietary principles all qualify as "religious exercises."

While the statute does not define "substantial burden," Fifth Circuit jurisprudence has defined it as follows in the context of the RLUIPA, "... a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559 (5th Cir. 2004) at 569-70.

sacred prayer circle to perform the ritual. Tribal music is played while a small fire of dried sage burns. The smoke from the sage is used to cleanse the body so it can be returned to Mother Earth and the soul so it can be returned to the Great Spirit. The Mourner would chant to the music while cleansing himself and the deceased. The ceremony is to be performed while Father Sun is high or around noon, so that the spirit of the deceased does not become lost on their journey to cross the river to be with their ancestors. At the end of the ceremony to honor Mother Earth reclaiming the body, a handful of dust is picked up and tossed into the wind to symbolize the spirit leaving the body to join their ancestors in the after life. [Doc. #17, Part I]

As can be seen, both of these ceremonies or rituals seemingly require the presence of other members of the tribe. It does not appear from the descriptions supplied by plaintiff that he could perform these rituals by himself.

Further, with regard to the Mourning Ceremony, he acknowledged that his grandmother's body was not available and therefore he intended to perform the ceremony using a picture of her; he also acknowledged that since he is imprisoned, he would have used incense instead of a sage fire. Plaintiff, however, has not shown that the defendants prohibited him from performing the latter ritual. Nevertheless, even if he was prohibited from performing the Mourning Ceremony, there exists a legitimate governmental interest in denying inmates access to burning incense. *Compare*, *Singson v. Norris*, 553 F.3d 660, 662 ("Prison safety and security are compelling government interests."); *Cutter v. Wilkinson*, 544 U.S. 709, 722, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) ( "RLUIPA does not 'elevate accommodation of religious observances over an institution's need to maintain order and security.' "); *McAlister v. Livingston*, 348 Fed.Appx. 923, 933 (5th Cir. 2009)(unpublished), citing *Dettmer v. Landon*, 799 F.2d 929, 933 (4th Cir.1986) (finding that

11

prisoner had no right to unsupervised use of candles and incense where candles could be "used as timing devices and to make impressions of keys," and incense could be used to cover smell of illegal drugs); *Young v. Saunders*, 34 Fed. Appx. 925, 926 (4th Cir.2002) (*per curium*) (finding that a prison's restrictions on incense and candles were reasonably related to legitimate penological interests); *Doty v. Lewis*, 995 F.Supp. 1081, 1085 (D.Ariz.1998) (acknowledging concerns expressed by prison staff that incense could be used by prisoners to mask the use of illegal drugs or narcotics). Under both the First Amendment and RLUIPA analysis, the courts must afford "due deference to prison administrator's experience and expertise." *Cutter v. Wilkinson*, 544 U.S. 709, 717, 125 S.Ct. 2113, 2119, 161 L.Ed.2d 1020 (2005).

To the extent that plaintiff claims that his preferred religious diet was not provided, he has also failed to state a claim for which relief may be granted. Simply put, prisons need not respond to particularized religious dietary requests to comply with the First Amendment. *See Kahey v. Jones*, 836 F.2d 948 (5th Cir.1988); *Udey v. Kastner*, 805 F.2d 1218 (5th Cir.1986), cited with approval in *Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007).

Plaintiff also complained that Christian inmates were afforded a month-long revival. He implies that his right to equal protection under the law was thus violated. However, again, he fails to state a claim for which relief may be granted. To succeed on this equal protection claim, plaintiff " 'must prove purposeful discrimination resulting in a discriminatory effect among persons similarly situated.' " *Adkins v. Kaspar*, 393 F.3d 559 at 566 (5th Cir. 2004) (quoting *Muhammad v. Lynaugh*, 966 F.2d 901, 903 (5th Cir.1992)). "However, the Fourteenth Amendment does not demand 'that every religious sect or group within a prison – however few in numbers – must have identical facilities or personnel.' " *Freeman v. Tex. Dep't. of Criminal Justice*, 369 F.3d 854, 862-63 (5th Cir.

2004) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972)). Prison officials must only afford prisoners "reasonable opportunities ... to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s]." *Cruz*, 405 U.S. at 322 n. 2, 92 S.Ct. 1079. Plaintiff's equal protection claim must fail. He has not alleged that similarly situated inmates are afforded superior treatment, or that the prisons' policies are the product of purposeful discrimination. While Christians may have greater access to facilities, services, and chaplains, that fact is no doubt more an issue of population rather than religious preference. "A special chapel or place of worship need not be provided for every faith regardless of size; <u>nor must a chaplain, priest, or minister be provided without regard to the extent of the demand</u>." *Cruz*, 405 U.S. at 322 n. 2, 92 S.Ct. 1079. (emphasis supplied) . The defendants are permitted to consider the demand and need of the group requesting services when deciding where religious groups will conduct their services. See *id.* (noting that the Constitution does not demand that every religious group, regardless of size, have identical facilities).

Plaintiff further faults the defendants for failing to provide an "Elder, a Native American Spiritual Adviser." However, plaintiff has not suggested that such a person was even available to provide spiritual services to him. As shown above, plaintiff, by his own admission was the only practitioner of the Native American religion at these facilities. It is unreasonable for him to expect the defendants to provide him and him alone with a minister or advisor of his own choosing.

Finally, read literally, it would appear that plaintiff complains, not so much that the defendants failed to provide for his religious and spiritual needs at ECDC and RBDC, but rather that they allowed a period of approximately 6-months to elapse before they transferred him to a

13

Louisiana Department of Corrections facility where he could ostensibly practice his religion.[2]

Plaintiff's claim is without a basis in law. Lawfully incarcerated persons, such as the plaintiff, retain only a narrow range of protected liberty interests. Broad discretionary authority is afforded to prison administrators because the administration of a prison is "at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2979, 41 L.Ed.2d 935 (1974) To hold that any substantial deprivation imposed by prison authorities triggers constitutional protections would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts. *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).

Prisoners do not have a constitutionally derived liberty interest in being held in any particular institution. See *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Adams v. Gunnell*, 729 F.2d 362, 368 (5th Cir. 1984); *Oladipupo v. Austin,* 104 F.Supp.2d 643 (W.D.La. 2000). Simply put, plaintiff "has no justifiable expectation that he will be incarcerated in any particular prison...." *Olim v. Wakinekona*, 461 U.S. at 245. His claim to the contrary is clearly frivolous.

---

[2] As noted above, plaintiff claims that there are prisons in Louisiana that provide services to Native American practitioners; however, he has not identified these prisons. Nevertheless, it will be assumed, for the purposes of this Report, that he is now able to fully practice Native American spirituality at his present place of incarceration.

Finally, plaintiff has prayed for compensatory damages for "[g]rief, mental anguish, emotional distress" [Doc. #1, ¶13] as well as punitive damages and injunctive relief. Plaintiff's transfer to Elayn Hunt Correctional Center renders his claims for injunctive relief against the ECDC and RBDC defendants moot. *See Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir.2001) (transfer from unit rendered prisoner's claims for declaratory and injunctive relief moot); see also *Cooper v. Sheriff, Lubbock County, Tex.*, 929 F.2d 1078, 1084 (5th Cir.1991) (same). His claim for compensatory damages, while not mooted by his transfer, is nonetheless subject to dismissal pursuant to 42 U.S.C. §1997e which provides that "[n]o federal civil action may be brought by a prisoner for mental or emotional injury suffered while in custody without a prior showing of physical injury." Plaintiff has not alleged, nor can the undersigned imagine, that he suffered any physical injury based upon the facts alleged. Plaintiff also seeks punitive damages from defendants. The physical injury requirement of § 1997e(e) does not bar a prisoner's right to recover punitive damages for constitutional violations. *Hutchins v. McDaniels*, 512 F.3d 193, 196-98 (5th Cir.2007). However, in order to warrant punitive damages, the prisoner must allege facts showing that defendants' conduct was egregious or reprehensible. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Punitive damages may be awarded in § 1983 cases when the defendants' conduct "is motivated by evil intent or demonstrates reckless or callous indifference to a person's constitutional rights.... The latter standard requires recklessness in its subjective form, i.e., a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir.2003). Clearly, read liberally, and taken as true for the purposes of this report, the facts alleged herein do not establish "evil intent" or "callous indifference" on the part of any of the defendants.

In short, plaintiff's practice of religion claims must be dismissed as frivolous and for failing to state a claim for which relief may be granted.

### 3. Access to Courts

Plaintiff also claims that he was denied his right of access to the courts. The right to access the courts requires that inmates be allowed a reasonably adequate opportunity to file non-frivolous lawsuits challenging their convictions and the conditions of their confinement. *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir.1999). Prison officials have considerable discretion in choosing the mechanism and forms of assistance they will furnish to prisoners for the purpose of allowing prisoners to file non-frivolous legal claims. *See Lewis v. Casey*, 518 U.S. 343, 356, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("Of course, we leave it to prison officials to determine how best to ensure that inmates ... have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement.")

Further, in order to prevail on a claim such as this, plaintiff must demonstrate an actual injury stemming from defendants' allegedly unconstitutional conduct. *Lewis v. Casey*, 518 U.S. 343, 351-54, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The plaintiff must show that his legal position has been prejudiced. *See Richardson v. McDonnell*, 841 F.2d 120, 122 (5th Cir.1988). In other words, he must allege and ultimately demonstrate that he was prevented from raising and litigating a meritorious legal issue. *Ruiz v. United States*, 160 F.3d 273, 275 (5th Cir.1998).

Plaintiff claims that his right of access was violated when prison authorities balked at providing copies and notarial services unless they were permitted to read his complaint prior to filing. Plaintiff claims that his complaint was "confidential"; however, that assertion is without a basis in law. This pleading was not confidential communication between plaintiff and his attorney;

16

indeed, the document was intended to be filed and was ultimately filed with the Clerk of the Court. Its destiny was to become a public record. Plaintiff can show no harm with resulted in the document being read prior to filing.

Plaintiff also maintains that he was unable to submit his complaint to the Sixth Judicial District Court because he was unable to have the complaint notarized. Plaintiff does not allege that he attempted to file the pleading, or that it was thereafter rejected by the Sixth Judicial District Court because it was unverified. Thus, he cannot show prejudice as required by the jurisprudence cited above. Further, the fact remains, that even if his attempt to file the complaint in state court was thwarted, he was nevertheless allowed to file and litigate his claim in this forum. Plaintiff's inability to demonstrate prejudice is fatal to his claim.

### 4. Grievance

Finally, plaintiff complains that he was denied an adequate prison grievance procedure because he was transferred from RBDC to ECDC before his grievances were settled. Since there is no constitutionally protected interest in the processing of an inmate's grievances, plaintiff's assertion that his constitutional rights were violated by the defendants' failure to process his grievances does not state a claim and is frivolous. *See Geiger v. Jowers*, 404 F.3d 371, 37374 (5th Cir.2005).

### *Conclusion and Recommendation*

Plaintiff's complaints do not establish Constitutional violation . Therefore,

**IT IS RECOMMENDED** that plaintiff's civil rights complaint be **DISMISSED WITH PREJUDICE** as frivolous and for failing to state a claim on which relief may be granted in accordance with the provisions of 28 U.S.C. §§ 1915 and 1915A.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14)days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See** *Douglass v. United Services Automobile Association,* **79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, October 13, 2010.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE